# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | |
| | § | |
| IN THE MATTER OF THE | § | No. 3:18-mj-765-BN |
| EXTRADITION OF | § | |
| | § | |
| TITO JAY RISNER A/K/A | § | |
| JAY MICHAEL RISNER A/K/A | § | |
| TITO RISNER A/K/A | § | |
| JAY M. RISNER A/K/A | § | |
| JOSE TITO RODRIGUEZ CALDERON. | § | |

## MEMORANDUM OPINION AND ORDER

### Applicable Background

On November 16, 2018, the United States of America filed a complaint for the extradition of Tito Jay Risner a/k/a Jay Michael Risner a/k/a Tito Risner a/k/a Jay M. Risner a/k/a Jose Tito Rodriguez Calderon ("Risner") at the request of the Government of the Republic of Colombia ("Colombia") pursuant to the extradition treaty between the United States and Colombia, the Extradition Treaty with the Republic of Colombia, U.S.-Colom., Sept. 14, 1979, S. TREATY DOC. NO. 97-8 (1981) (the "Treaty"), *available at* 1979 U.S.T. LEXIS 199. The United States seeks Mr. Risner's extradition in accordance with its treaty obligations to Colombia, *see* Dkt. No. 1, and moved to detain Mr. Risner following his arrest on a warrant [Dkt. No. 22] issued in connection with the United States's complaint filed under 18 U.S.C. § 3184, *see* Dkt. Nos. 5 & 14.

Mr. Risner, through his retained counsel, filed a Motion to Dismiss, *see* Dkt. No. 23, asserting that, "[i]n this extradition request, Colombia has failed to follow

extradition procedures and provide all required documents pursuant to Article 9 of the Extradition Treaty with the Republic of Colombia, U.S.-Colom., Sept. 14, 1979, S. TREATY DOC. NO. 97-8 (1981) ('Treaty')," and that "Colombia is in violation of the terms of the treaty, therefore this matter must be dismissed," *id.* at 1.

The United States then filed a Notice of Filing of Supplement to Extradition Request, *see* Dkt. No. 26, in which it explained:

> On November 16, 2018, Tito Risner a/k/a Jay Risner a/k/a Jose Tito Rodriguez Calderon ("Risner," "Rodriguez Calderon," or the "fugitive") was arrested on the basis of a complaint seeking his extradition to the Republic of Colombia ("Colombia") to serve a sentence for aggravated homicide. Attached to the filed complaint was the original Extradition Request submitted by the Government of Columbia (ECF No. 1-1).
>
> On February 23, 2018, the United States sent a diplomatic note to Columbia requesting that the Government of Columbia submit a certified supplement to the original extradition package from Columbia. In this diplomatic note, the United States requested that Columbia submit a Supplement which provides a text of the applicable Columbian laws describing the essential elements and designation of the offenses for which extradition is requested, and describing the time limit on the prosecution of the execution of punishment for the offenses as required by Articles 9(2) and 9(5) of the Extradition Treaty between the United States and the Republic of Columbia.
>
> Attached hereto as Exhibit A is the certified Supplement (dated July 23, 2018) with Spanish and English translations which was provided to the United States by the Government of Columbia. This Supplement to the original Extradition Request is admissible at the extradition hearing pursuant to 18 U.S.C. § 3190.

*Id.* at 1-2.

The United States then filed the Government's Response in Opposition to Fugitive's Motion to Dismiss Complaint, *see* Dkt. No. 36, and a Notice of Filing – Supplemental Document, *see* Dkt. No. 37, in which it explained that

> [a]ttached hereto is a diplomatic note from the Government of Colombia,

dated January 3, 2019, to the Government of the United States, explaining that the fugitive's arrest in the United States on November 16, 2018, interrupted the Colombian limitations period, which otherwise was set to expire on November 23, 2018.

*Id.* at 1 (footnote omitted). The United States also noted that, "[i]n providing this information, neither government concedes that the Treaty required the Government of Colombia to submit it." *Id.* at 1 n.1.

Mr. Risner then filed his Relator's Reply to Government's Response to Motion to Dismiss, *see* Dkt. No. 38, and Supplement to Relator's Reply to Government's Response to Motion to Dismiss, *see* Dkt. No. 42.

The undersigned United States magistrate judge is authorized to conduct the proceedings in this matter under 18 U.S.C. § 3184 and 28 U.S.C. § 636. *See Noel v. U.S.*, 12 F. Supp. 2d 1300, 1305 (M.D. Fla. 1998); *see generally Ntakirutimana v. Reno*, 184 F.3d 419, 423 n.8 (5th Cir. 1999) ("The judicial officer, whether state or federal, who is authorized to hold an extradition hearing pursuant to the terms of 18 U.S.C. § 3184 is often referred to as a 'magistrate' or as the 'committing court.'").

The Court denied Mr. Risner's Motion to Dismiss [Dkt. No. 23], *see* Dkt. No. 55, and, after pre-hearing briefing, *see* Dkt. Nos. 62, 63, 66, 68, 69, 70, & 71; *see also* Dkt. No. 75 (post-hearing supplemental filing), held the extradition hearing under 18 U.S.C. § 3184 on July 31, 2019, *see* Dkt. Nos. 72, 74, & 75.

As further background, the United States asserts that,

[a]ccording to information the Government of Colombia has provided:
On December 9, 1994, the Colombian Criminal Court Six, Circuit of Cartagena, found the fugitive guilty of the aggravated homicide of his wife, Patricia Gomez de Risner (the "victim" or "Risner's wife"), in

violation of Article 323 of Colombia's Criminal Code, and sentenced him to twenty years imprisonment. The conviction was affirmed on appeal, first by the Superior Tribunal of the Judicial District of Cartagena on April 20, 1995, and then by the Supreme Court of Justice, Criminal Cassation Division, on November 23, 1998. The extradition request from the Government of Colombia contains supporting documentation including the aforementioned Colombian court decisions, which reflect the following:

a. The victim was Risner's wife. She was born in Colombia, and lived in Texas.

b. In early July, 1990, the victim and Risner were visiting Cartagena, Colombia. On July 4, 1990, the victim was shot fatally while walking with her sister and mother.

c. Colombian police officers arrested Raul Alberto Ramirez Montoya (Ramirez Montoya) and Yolanda Zuluaga Velez (Zuluaga Velez) at the scene. The two were implicated in the homicide through questioning and were convicted of the murder.

d. Hotel and other records reflected that the Risners arrived at the Hotel Bellavista in Cartagena three days before the murder, on July 1, 1990. Risner's co-defendant and relative, Jairo Hernandez Pachon ("Hernandez Pachon"), arrived at the same hotel on the same date, and shared a room with Ramirez Montoya and Zuluaga Velez, adjacent to the room that Risner and his wife occupied. [In the same proceeding as Risner, the court convicted Hernandez Pachon of being an accomplice to the aggravated homicide and sentenced Hernandez Pachon to ten years imprisonment.] Hernandez Pachon also paid Ramirez Montoya and Zuluaga Velez's hotel bill. Given their proximity to the victim while she was a guest at the hotel, Ramirez Montoya and Zuluaga Velez had opportunities to become aware of the victim's identity and appearance. Further, a Colombian police agent testified that he had obtained confidential information that when Risner and his wife were walking on the beach, Risner "made signs" to hire Hernandez Pachon and his companions.

e. Risner was the beneficiary of at least five policies insuring the victim's life for a total value of approximately USD $1.73 million in the 1990s. Some, if not all, of the insurance companies investigated the victim's death and had declined to pay the proceeds to Rodriguez Calderon, prompting Risner to sue them in the United States District Court for the Northern District of Texas. *See Risner v. Amex Life Assur. Co.*, No. Civ. A No. 3-91-1646, 1993 WL 55957, at *1 (N.D. Tex. Jan. 19, 1993) (noting that Tito Risner was the designated beneficiary of several life insurance policies on the victim's life and had tried to collect against seven insurance companies). The Colombian court had before it the

results of said investigation. The court found that Risner had purchased an abnormal number of policies on the victim's life, in an abnormal amount, considering that the victim worked as a nurse and was not exposed to sufficient risk to justify such coverage. The court also noted that the policies exceeded the couple's economic capacity. [On approximately January 16, 1991, plaintiff Tito Jay Risner also appears to have filed suit against the Estate of Patricia Gomez Risner in Dallas County Probate Court (Case No. PR-91-00180-1).]

f. According to the victim's sister, during the afternoon of the shooting, Risner continuously passed from one side to the other of the hotel windows, from which he could see the street and watch the shooting occur.

g. Following the murder, Colombian law enforcement interviewed Risner, who asserted that his wife's death should not be investigated. Colombian authorities who conducted the interview also reported that Risner seemed defensive and told them he did not know why they were taking his statement. [In its decision, the Colombian court listed the evidence before it, including an "Affidavit of Tito Risner."] Crediting testimony from a police agent who testified based on observing Risner and fifteen years of professional experience, the court found that Risner exhibited a strange and cunning attitude at the interview.

h. According to the victim's family, the fugitive told them to do nothing regarding the investigation because there was no point to it.

i. Risner departed Colombia abruptly on July 6, 1990, the day after the victim's burial.

j. Ramirez Montoya, who ultimately was convicted of the murder, made statements to police in an effort to prove his own innocence. For example, Ramirez Montoya stated that the victim's husband was outside of and opposite the hotel where the shooting occurred and described the clothes the victim's husband was wearing. The Colombian court found that a prior familiarity and criminal link existed between Ramirez Montoya and Risner because Risner was not on the scene when the shooting occurred, whereas Ramirez Montoya was apprehended immediately after the shooting, and Ramirez Montoya's mentioning an absent stranger to exculpate himself would have made little sense.

k. According to the victim's family, although Risner had told the victim that he was a bachelor Spaniard named Tito Jay Risner, they discovered after the victim's murder that, in fact, he was a married Colombian named Jose Tito Rodriguez Calderon. In April 1993, the victim's sister reported to Colombian law enforcement, based on information she had received from the fugitive's sister's husband, that Rodriguez Calderon had changed his name to Risner upon moving to the United States. Colombian law enforcement determined, from Colombian

civil records including a photographic identity card, that Risner was born in Colombia on February 6, 1944, as Jose Tito Rodriguez Calderon (and was listed in records from 1965 as married to a woman named Fronny Avillan, to whom the Colombian court alternately refers as Fronny Saito). [The extradition request includes a copy of the fugitive's Colombian identity card, which was issued on July 30, 1965, reflecting this information. See DOJ-OIA-008 (translation at DOJ-OIA-127).] The Colombian court found, based on testimony from the victim's family, that the victim was unaware of Risner's double identity despite being married to him and having two children with him, that Risner had deceived the victim about his identity, and that this deception indicated that Risner had mounted a plot against the victim.

l. While Risner was not physically present for the Colombian court proceedings against him, the Colombian court received and admitted two power-of-attorney forms from Tito Jay Risner.

m. The Colombian court decisions indicate that Risner's Colombian counsel did not contest that Risner is Rodriguez Calderon.

Dkt. No. 14 at 2-5 (footnotes omitted).

## Legal Standards

"The extradition process is *sui generis*." *Matter of Extradition of Noeller*, No. 17 CR 664, 2018 WL 1027513, at *6 (N.D. Ill. Feb. 23, 2018) (citing *Skaftouros v. United States*, 667 F.3d 144, 155 (2d Cir. 2011)). It is "primarily an executive function, with the court playing a defined and limited role." *Id.*; *see Noeller v. Wojdylo*, 922 F.3d 797, 802 (7th Cir. 2019) ("'Authority over the extradition process is shared between the executive and judicial branches.'" (quoting *Santos v. Thomas*, 830 F.3d 987, 991 (9th Cir. 2016) (en banc))). And, because "the judicial role is narrow, ... discretionary judgments and matters of political and humanitarian judgment are left to the executive branch." *Noeller*, 922 F.3d at 802; *see also, e.g.*, *Martin v. Warden, Atlanta Pen*, 993 F.2d 824, 830 n.10 (11th Cir. 1993) ("[J]udicial intervention in extradition proceedings based on humanitarian considerations is inappropriate. Rather,

humanitarian considerations are matters properly reviewed by the Department of

State." (citing *Escobedo v. United States*, 623 F.2d 1098, 1107 (5th Cir. 1980))).

> [That t]he larger assessment of extradition and its consequences is
> committed to the Secretary of State ... reflects the fact that extradition
> proceedings contain legal issues peculiarly suited for judicial resolution,
> such as questions of the standard of proof, competence of evidence, and
> treaty construction, yet simultaneously implicate questions of foreign
> policy, which are better answered by the executive branch. Both
> institutional competence rationales and our constitutional structure,
> which places primary responsibility for foreign affairs in the executive
> branch support this division of labor.

*United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997) (citation omitted).

The United States Court of Appeals for the Fifth Circuit has previously

"outlin[ed] the process of international extradition":

> The substantive right of a foreign country to request the return of a
> fugitive and the duty of the United States to deliver the fugitive depends
> entirely on the existence of a treaty between the requesting nation and
> the United States. 18 U.S.C. § 3181 (1976), *Factor v. Laubenheimer*, 290
> U.S. 276, 287, 54 S. Ct. 191, 193, 78 L. Ed. 315 (1933). To invoke its right
> to extradite a fugitive, the requesting nation must submit its request to
> a state or federal court. 18 U.S.C. § 3184 (1976). (In practice, the
> requesting nation submits its request to the Secretary of State who may
> request the Justice Department to file a verified extradition complaint.
> *See Matter of Assarsson*, 670 F.2d 722, 725 (7th Cir. 1982).) The court
> determines whether the fugitive is subject to extradition and, if so, must
> order the fugitive's commitment and certify the supporting record to the
> Secretary of State. *Id.* The decision to surrender the fugitive then rests
> in the discretion of the Secretary of State. 18 U.S.C. § 3186 (1976);
> *Escobedo v. United States*, 623 F.2d 1098, 1105 n.20 (5th Cir.), *cert.
> denied*, 449 U.S. 1036, 101 S. Ct. 612, 66 L. Ed. 2d 497 (1980).

*In re U.S.*, 713 F.2d 105, 107-08 (5th Cir. 1983) (footnote omitted).

18 U.S.C. § 3184 provides:

Whenever there is a treaty or convention for extradition between the
United States and any foreign government, or in cases arising under

section 3181(b), any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, or provided for under section 3181(b), issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate judge, to the end that the evidence of criminality may be heard and considered. Such complaint may be filed before and such warrant may be issued by a judge or magistrate judge of the United States District Court for the District of Columbia if the whereabouts within the United States of the person charged are not known or, if there is reason to believe the person will shortly enter the United States. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, or under section 3181(b), he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

18 U.S.C. § 3184; *see also* 18 U.S.C. § 3181(a)(1) ("The provisions of this chapter relating to the surrender of persons who have committed crimes in foreign countries shall continue in force only during the existence of any treaty of extradition with such foreign government."). "This section authorizes a judicial officer to hold a hearing to consider a request for surrender. If the judicial officer finds the evidence sufficient to sustain the charges under the treaty or convention, then the officer certifies to the Secretary of State that the individual may be surrendered." *Ntakirutimana*, 184 F.3d at 422 (citing 18 U.S.C. § 3186 ("conferring final authority on the Secretary of State to order a fugitive's surrender where a judicial officer has ruled that the requirements for extradition have been met")).

As another judge in this circuit recently explained:

> International extradition proceedings are governed both by statute (18 U.S.C. §§ 3181, 3184, 3186, 3188-3191) and by treaty. *See* 18 U.S.C. § 3184. In applying an extradition treaty, the court is to construe it liberally in favor of the requesting nation. *Factor v. Laubenheimer*, 290 U.S. 276, 293-94 (1933). .... Because the Treaty is central to the proceedings, at the extradition hearing, the court will have to determine whether the Treaty is a valid extradition treaty in force between the United States and [the requesting country], then must determine whether it is applicable, and finally consider whether the requirements of the treaty have been satisfied. *See* 18 U.S.C. § 3184; *Bozilov v. Seifert*, 983 F.2d 140, 143 (S.D.N.Y. 1999) (considering whether extradition request was made timely under the terms of the treaty).
>
> In addition to determining the validity and applicability of the Treaty, the court must determine whether the charged offenses may provide a basis for [Risner's] extradition. This requires that the court determine whether the charged offenses are listed in the Treaty as extraditable offenses. *See, e.g.*, *Cucuzzella v. Keliikoa*, 638 F.2d 105, 107 (9th Cir. 1981). ....
>
> The court must finally determine whether the evidence supports a probable cause finding as to each charged offense. *Matter of Extradition of Lahoria*, 932 F. Supp. 802, 805 (N.D. Tex. 1996). According to the applicable statute, the court's responsibility is to determine whether, under the Treaty, the evidence is sufficient to sustain the charges that [Risner] committed the offenses alleged in the complaint. 18 U.S.C. § 3184.

*U.S. v. Valentino*, Case No. 4:18-mj-00146, 2018 WL 2187645, at *4 (S.D. Tex. May 11, 2018).

"Although Section 3184 requires the court to decide whether 'evidence [is] sufficient to sustain the charge,' the scope of an evidentiary hearing is not to determine guilt or innocence." *Bonilla*, 2014 WL 934903, at *3; *see Noeller*, 2018 WL 1027513, at *7 ("It cannot be too often repeated that the core limitation applicable in extradition hearings in federal court is that an extradition proceeding is not a trial. Questions of credibility and guilt or innocence are not to be considered. These limitations have been

recognized by every court in every extradition case since the beginning of the Republic." (citations omitted)). Rather,

> the court fulfills its limited function by conducting a "hearing [that] determines only whether circumstances warrant certification that the respondent is eligible for extradition." *Bonilla*, 2014 WL 934903, at *3 (emphasis added). Evidentiary factors relevant to the court's determination include:
>
>> 1. Personal and subject matter jurisdiction; 2. Existence of a valid extradition treaty between United States of America and foreign requesting state; 3. Required documents presented in accordance with United States law, translated and duly authenticated by a United States consul; 4. Pending criminal charge in foreign requesting state; 5. Offense charged is extraditable; 6. Offense charged satisfies requirement of double criminality; 7. Respondent is person sought; and 8. Probable cause.
>
> *Id.* at *4 (emphasis added).

*Godwin*, 2014 WL 5093281, at *1-*2 (emphasis omitted and citation modified).

> As the Fifth Circuit has generally explained,
>
> [c]ertification of eligibility for extradition requires a finding of probable cause that the accused committed the charged offense. Probable cause is "the existence of a reasonable ground to believe the accused guilty of the crime."

*Quintanilla v. U.S.*, 582 F. App'x 412, 415 (5th Cir. 2014) (citations omitted); *accord Ntakirutimana*, 184 F.3d at 427 ("In reviewing a request for surrender, the committing court must determine whether probable cause exists to sustain the charges against the accused."). And Mr. Risner asserts that

> [t]he fact that Colombia convicted Mr. Risner does not alter the analysis because the conviction was in absentia. When a conviction is obtained in absentia, courts have treated the extradition request as if it involved a pending charge, therefore still requiring sufficient and independent evidence to justify a reasonable belief that the relator committed the

crime. *See, e.g., Germany v. United States*, 2007 U.S. Dist. LEXIS 65676, at *20-21 (E.D.N.Y. Sep. 5, 2007) ("Where a defendant was convicted in absentia, the conviction is merely a charge and an independent determination of probable cause in order to extradite must be made"); *Argento v. Horn*, 241 F.2d 258, 259 n.1 (6th Cir. 1957); *Gallina v. Fraser*, 278 F.2d 77, 78-9 (2nd Cir. 1960). Presence of counsel alone at a trial is insufficient to give an in absentia conviction conclusive effect for a probable cause determination. *See In re Extradition of Ernst*, 1998 U.S. Dist. LEXIS 10523, at *21-4 (S.D.N.Y. July 14, 1998); *see also United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1365 (S.D. Fla. 1999) (finding that relators were convicted in absentia despite having been represented by counsel).

Dkt. No. 24 at 8. Another judge in this circuit recently considered the state of the law on this issue:

In this case, the parties disagree on the significance of the conviction by the Dutch court. The United States Government argues it is de facto proof of probable cause to support the charges. Valentino contends that when, as here, the conviction is obtained in absentia, it should be considered nothing more than a "mere charge" so that probable cause must still be established independently of the conviction. The courts in this Circuit do not appear to have directly addressed this issue. *See Matter of Extradition of Porumb*, No. 6:18-MJ-00010, 2018 WL 814568, at *4 (W.D. La. Feb. 9, 2018) ("The Government counters that no probable cause determination is required because he was already convicted albeit *in absentia. Assuming without deciding* the Government's position as to the second requirement is correct....") (emphasis added). Courts in other circuits have reached conflicting conclusions. *Compare United States v. Bogue*, No. 98-CRIM.A.-572-M, 1998 WL 966070, at *2 (E.D. Pa. Oct. 13, 1998) ("[A] conviction, although obtained in absentia, provides sufficient evidence of criminality to satisfy the probable cause requirements of 18 U.S.C. § 3184.") *with In Matter of Extradition of Ernst*, No. 97 CRIM.MISC.1 PG.22, 1998 WL 395267, at *7 (S.D.N.Y. July 14, 1998) ("[W]here, as in this case, the conviction is the result of a trial in absentia, the conviction is regarded merely as a charge, requiring independent proof of probable cause.").

Convictions in absentia can generally be organized into three categories: 1) cases in which the accused was present for some or all of the proceeding leading to the conviction, *U.S. ex rel. Bloomfield v. Gengler*, 507 F.2d 925 (2d Cir. 1974) (present for trial at which he was acquitted, not present for appeal that overturned acquittal); *Lindstrom*

*v. Gilkey*, No. 98 C 5191, 1999 WL 342320 (N.D. Ill. May 14, 1999) (present for majority of trial before fleeing); 2) cases in which the accused was not present but was fully represented by counsel, *Gallina v. Fraser*, 177 F. Supp. 856, 859 (D. Conn. 1959), *aff'd*, 278 F.2d 77 (2d Cir. 1960); and 3) cases in which the accused was entirely unrepresented. *In re Ribaudo*, No. 00 CRIM.MISC.1PG.KN, 2004 WL 213021 (S.D.N.Y. Feb. 3, 2004). Although not universal, the overriding principal in cases involving convictions in absentia appears to be this: when there is credible evidence supporting the conviction, either because the accused defended himself at trial, had evidence presented on his behalf at trial, or the requesting state has provided evidence supporting the conviction in its request for extradition, a conviction in absentia can be evidence of probable cause. When those indicators are absent, it is reasonable for a court to consider the sufficiency of the evidence when a conviction is obtained in absentia.

*Valentino*, 2018 WL 2187645, at *4-*5.

And, in this instance, Article 9 of the Treaty provides, among other things:

(1) The request for extradition shall be made through the diplomatic channel.

(2) The request for extradition shall be accompanied by:

(a) Documents, statements, or other evidence which describe the identity and probable location of the person sought;

(b) A statement of the facts of the case;

(c) The texts of the laws describing the essential elements and the designation of the offense for which extradition is requested;

(d) The texts of the laws describing the punishment for the offense; and

(e) The texts of the laws describing the time limit on the prosecution or the execution of punishment for the offense.

(3) When the request for extradition relates to a person who has not been convicted, it shall be accompanied by:

(a) A copy of the indictment or its equivalent issued by a judge or other judicial authority of the Requesting State;

(b) Evidence proving that the person sought is the person to whom the indictment or its equivalent refers; and

(c) Such evidence as would provide probable cause to suspect, according to the laws of the Requested State, that the person sought has committed the offense for which extradition is requested.

(4) When the request for extradition relates to a convicted person, it shall be accompanied by:

(a) A copy of the judgment of conviction imposed by a court of the Requesting State; and

(b) Evidence proving that the person sought is the person to whom the conviction refers.

If the person has been found guilty but not sentenced, the request for extradition shall also be accompanied by evidence to that effect and by a copy of the warrant of arrest.

If the convicted person has been sentenced, the request for extradition shall also be accompanied by a copy of the sentence imposed and a statement showing to what extent the sentence has not been carried out.

(5) All the documents to be submitted by the Requesting State in accordance with Articles 9 and 10 of this Treaty shall be translated into the language of the Requested State.

(6) The documents which accompany the extradition request shall be admitted into evidence when:

(a) In the case of a request emanating from the United States, they are signed by a judge, magistrate or other judicial officer and authenticated by the official seal of the Department of State and certified by a diplomatic or consular officer of the Republic of Colombia in the United States.

(b) In the case of a request emanating from the Republic of Colombia they are signed by a judge or other judicial authority and are certified by the principal diplomatic or consular officer of the United States of America in the Republic of Colombia.

(7) The Requested State shall review for legal sufficiency documentation in support of an extradition request prior to presentation to the judicial authorities and shall provide for legal representation to protect the interests of the Requesting State before the competent authorities of the Requested State.

Treaty at Art. 9.

The Federal Rules of Criminal Procedure do not govern extradition proceedings under 18 U.S.C. § 3184. *See* FED. R. CRIM. P. 1(a)(5)(A) ("Proceedings not governed by these rules include: (A) the extradition and rendition of a fugitive...."). And "[t]he evidentiary rules governing ordinary civil and criminal trials do not control what may be admitted in an extradition hearing." *Balzan v. U.S.*, 702 F.3d 220, 224 (5th Cir.

2012); *see also* FED. R. CRIM. P. 1101(d)(3) ("These rules – except for those on privilege – do not apply to the following: ... (3) miscellaneous proceedings such as: extradition or rendition...."). Rather, 18 U.S.C. § 3190 provides that

> [d]epositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required.

18 U.S.C. § 3190.

> Under 18 U.S.C. § 3190, a properly authenticated document is admissible at such a hearing. Consequently, authenticated documents may serve as competent evidence in support of a magistrate's determination.

*Balzan*, 702 F.3d at 224 (footnotes omitted); *see also Ntakirutimana,* 184 F.3d at 429-30 ("The district court declined to address Ntakirutimana's challenge to the reliability of the translations. The court stated that, as long as the evidence is authenticated in accordance with § 3190, then it would not consider challenges to the reliability of the translation. We agree with the district court that we can presume that the translations are correct. The extradition court need not independently inquire into the accuracy of the translations submitted with a formal extradition request, because '[s]uch a requirement would place an unbearable burden upon extradition courts and seriously impair the extradition process.'" (footnote and citations omitted)).

### Analysis

As the parties here acknowledge, the Court must make five findings to certify:

(1) the judicial officer is authorized to conduct the proceeding, (2) the court has jurisdiction over the fugitive, (3) the Treaty is in full force and effect, (4) the Treaty covers the crime for which Colombia seeks extradition; and (5) probable cause to believe that Mr. Risner committed the offense for which extradition is sought.

As explained above, the undersigned is authorized to conduct this 18 U.S.C. § 3184 proceeding. The Court has personal jurisdiction over Mr. Risner, who is a United States citizen who lives and is domiciled in, and was arrested on this Court's warrant in, the Northern District of Texas. *See* 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction ... issue his warrant for the apprehension of the person so charged."). And Mr. Risner is the person that Colombia seeks, as the individual who has been convicted in Colombia of the aggravated homicide of his wife, Patricia Gomez de Risner.

Mr. Risner does not dispute that the Treaty covers the crime for which Colombia seeks extradition, and the government has shown that it does, explaining:

> Extradition treaties create an obligation for the United States to surrender fugitives under particular circumstances. Here, Article 2 of the Treaty defines extraditable offenses as (a) "Offenses described in the Appendix to this Treaty which are punishable under the laws of both Contracting Parties;" or (b) "Offenses, whether listed in the Appendix to this Treaty or not, provided they are punishable under the Federal laws of the United States and the laws of the Republic of Colombia ... if the offense is punishable under the laws of both Contracting Parties by deprivation of liberty for a period exceeding one year." Treaty Art. 2. The crime of aggravated homicide is extraditable on both of these independent bases.
> In this case, Colombia seeks the fugitive's extradition for aggravated homicide, and the Appendix to the Treaty expressly provides that murder is an extraditable offense; therefore, Treaty covers the crime.
> Even if this were not so, Risner's conduct is punishable in both

Colombia and the United States by deprivation of liberty for a period exceeding one year. Dual criminality exists if the conduct involved in the foreign offense would be criminal under either U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *Cucuzzella v. Keliikoa*, 638 F. 2d 105, 107-108 (9th Cir. 1981); *In re Extradition of Manzi*, 888 F. 2d 204, 207 (1st Cir. 1989); *Quintanilla v. United States*, 582 F. App'x 412, 414 (5th Cir. 2014). Because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers[,]" *Grin v. Shine*, 187 U.S. 181, 184 (1902); see Factor, 290 U.S. at 303, the court should "approach challenges to extradition with a view toward finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981); see also *Martinez v. United States*, 828 F. 3d 451, 463 (6th Cir. 2016) ("The point of an extradition treaty after all is to facilitate extradition...."). Thus, a requesting country is not obliged to establish that its crimes are identical to ours. In *Collins v. Loisel*, the Supreme Court held that dual criminality exists "if the particular act charged is criminal in both jurisdictions," even if the name of the offense or the scope of the liability differs in the two countries. 259 U.S. at 312. "This language has been broadly accepted as establishing that dual criminality requires only that the offenses in the two countries punish the same basic evil; it does not require that the offenses contain identical elements." *Zhenli Ye Gon v. Holt*, 774 F. 3d 207, 217 (4th Cir. 2014); *see also Kelly v. Griffin*, 241 U.S. 6, 15 (1916); *Gallo-Chamorro v. United States*, 233 F. 3d 1298, 1307 (11th Cir. 2000), *cert. denied*, 516 U.S. 811 (1995); *United States v. Saccoccia*, 58 F. 3d 754, 766 (1st Cir. 1995), *cert. denied*, 517 U.S. 1105 (1996); *United States v. Riviere*, 924 F. 2d 1289, 1302 (3d Cir. 1991) ("[T]he rule of double criminality does not require that the elements, purposes, or punishment for foreign offenses be identical to ours.").

Here, Colombia requests Risner' extradition based on his conviction for the crime of aggravated homicide, for which the court sentenced him to twenty years imprisonment, and which, according to the information Colombia has presented, is punishable under Article 324 of Colombia's Criminal Code by up to 30 years imprisonment. The same alleged conduct would be criminal, if it were committed in the United States, under statutes including 18 U.S.C. § 1117 (murder), § 1958 (use of interstate commerce facilities in commission of murder for hire), and/or § 373 (solicitation to commit a crime of violence); and/or Tex. Pen. Code §§ 19.02-19.03(a)(3) (murder); § 15.02 (conspiracy to murder); and/or § 15.03 (solicitation to murder[),] all of which are punishable by more than one year imprisonment. In this additional, independent respect, the Treaty covers the offense for which Colombia seeks extradition.

Dkt. No. 6 at 10-13 (footnotes omitted).

For the reasons that the United States has explained, the Court finds that the Treaty covers the crime for which Colombia seeks extradition and that any requirement of double criminality is satisfied here.

Mr. Risner does challenge three requirements for certification, contending that (1) the Extradition of Mr. Risner cannot be certified based on a request made pursuant to a Colombian Criminal Procedure Code and not the Treaty; (2) there is no extradition treaty in effect between the United States and Colombia; and (3) Colombia's extradition request fails to establish probable cause that Mr. Risner directed the murder of his wife. *See* Dkt. Nos. 66 & 70; Dkt. No. 74 at 29-33.

I.    <u>Colombia made its extradition request pursuant to the Treaty.</u>

Mr. Risner first contends that "Colombia's request to extradite Mr. Risner is made pursuant to domestic Colombian law and not pursuant to the un-ratified treaty between the United States and Colombia"; "[t]his fundamental defect in the request fails to authorize this court to decide the issue pursuant to 18 U.S.C. § 3184"; and "[t]he extradition request by Colombia not only supports the argument that no valid treaty exists, it also mandates an outright dismissal based on a complete lack of jurisdiction." Dkt. No. 71 at 2. According to Mr. Risner, "Colombia's extradition request of Mr. Risner pursuant to 'article 569 of the Colombian Criminal Procedural Code,' does not establish this Court's authority to certify this matter for extradition," *id.* (quoting Dkt. No. 1-1 at ID 11-12; Dkt. No. 71-3, Ex. A), and "[t]here is no mention of a treaty, unratified or otherwise, in this request," where "[t]he right of a foreign sovereign to

demand and obtain extradition is created by treaty, not domestic statutes" and "this request for certification of extradition pursuant to section 3184 must be dismissed, as the request itself is made outside the scope of this Court's jurisdiction," *id.*

Mr. Risner's counsel acknowledges that she has been unable to locate a case analyzing this challenge to an extradition request. *See* Dkt. No. 74 at 31.

The United States responds that this challenge is meritless where, although the Government of Colombia did not expressly cite the Treaty in its diplomatic note requesting extradition,

1.     Colombia followed the Treaty's procedures and requirements for submitting an extradition;

2.     Colombia's request complies fully with Article 9 of the Treaty;

3.     18 U.S.C. § 3184 does not require Colombia to expressly cite the Treaty in its diplomatic note;

4.     The Treaty contains no requirement that a diplomatic note seeking extradition expressly must cite the Treaty but, in Article 9, simply states that extradition requests be made by the diplomatic channel;

5.     Both the United States and Colombia understood that Colombia submitted the request in accordance with the Treaty and that it was to be processed under the Treaty;

6.     The diplomatic note in this matter does not say that Colombia is requesting extradition pursuant to Colombian law or a a Colombian domestic statute but rather that the diplomatic mission is forwarding a list of documents making up

the corresponding record which was submitted by the Ministry of Justice and Law accrediting compliance with the conditions to formalize an extradition application as set forth in Colombian domestic extradition law; and

7. The diplomatic notes in two other matters in which Colombia sought extradition did not expressly invoke the extradition treaty.

Mr. Risner replies that the problem with the Government's argument is that providing of documentation in support of the extradition application would need to be, if pursuant to Treaty, pursuant to Article 9 of the Treaty, not pursuant to the Colombian Criminal Procedure Code. And, according to Mr. Risner, it is irrelevant that Colombia has in the past submitted requests not pursuant to Treaty, because what is in front of this Court right now is whether or not this Court is empowered by Section 3184 to consider certifying for extradition a request that a United States citizen go to a foreign country without the invocation of a treaty.

The Court is not persuaded by Mr. Risner's arguments. The record here supports that Colombia sought his extradition pursuant to the Treaty. And neither the Treaty, Section 3184, nor case law supports Mr. Risner's contention that Colombia's diplomatic note must expressly mention the Treaty.

II.     The Treaty is valid and in effect.

Mr. Risner argues that, even if Colombia invoked the Treaty, "Colombia never ratified the Treaty," where

> [t]he head of the legal office of the Ministry of Justice in Colombia at the time of the extradition request acknowledged that the Treaty was not ratified, stating, "[i]n this case, account should be taken of the terms of

the Criminal Procedure Code, since with the Government of the United States of America the Extradition Treaty, although enforced at international level, is not applicable internally, since it lacks the requirement of congressional approval." (ID 196.)

Because Article 21(1) expressly made the Treaty "subject to ratification," the Treaty could not take effect until both parties successfully ratified it under their respective laws. It is well established that Colombia never ratified the Treaty and is therefore not a party to it. Extradition from the United States requires "a valid extradition treaty … in force through appropriate enabling legislation." *In re Extradition of Mejuto*, 14-M-515, 2014 WL 2710948, at *3 (E.D. Pa. June 13, 2014).

Because Colombia never ratified the Treaty, there is no valid Treaty in place on which to extradite Mr. Risner.

Dkt. No. 66 at 4-5 (citations omitted). And, according to Mr. Risner,

"[a]lthough the view has been expressed that the United States will grant or request extradition only pursuant to a treaty, there have been several instances where the United States has deviated from that practice. In these instances, extradition was granted or requested on the basis of comity or reciprocity." Bassiouni, supra, at 90 (emphasis added). The reliance on reciprocity in place of a treaty is a part of international principles of friendly cooperation among nations. *Id.* at 47. Because there is no ratified treaty in place between the United States and Colombia, the parties must rely on the theory of reciprocity as the basis for the extradition request.

Reciprocity is not a basis for extradition because as recently as May 15, 2019 Colombia refused the United States extradition request of Seuxis Hernandez, better known as Jesus Santrich, a notorious drug trafficker. See Kejal Vyas, Colombia Court Orders Release of Ex-FARC Leader Wanted by U.S., THE WALL STREET JOURNAL (May 15, 2019, 10:44 PM), https://on.wsj.com/2WfmAtT. Hernandez was indicted over a year ago by the United States for conspiracy to export ten tons of cocaine, worth $320 million in street value.

Colombia's rejection of the United States request for extradition compels the conclusion that reciprocity as a basis for extradition is not applicable here.

....

[And, e]ven if it is determined that there is a valid mechanism in place by which to extradite Mr. Risner, Colombia's own law prohibits his extradition. Article 35 of the Constitution of Colombia states that, "[e]xtradition shall not proceed in the case of acts committed prior to the promulgation of this norm." This norm was promulgated on December 16,

1997. Patricia Risner was killed on July 4, 1990. In requesting extradition of Mr. Risner, Colombian authorities are violating their own constitution.

"[A]ccording to the provisions of the final paragraph of Article 35 of the Constitution of Colombia, as modified by Legislative Act 01 of 1997, extradition is prohibited – both actively and passively – for events that took place prior to the sixteenth (16) of December 1997." (Morales legal opinion at 18.)

Because the crime took place in 1990 extradition is prohibited pursuant to Colombian law.

Dkt. No. 66 at 5-6.

The United States Court of Appeals for the Eleventh Circuit recently addressed this issue and determined that "the Treaty remains in effect." *Arias Leiva v. Warden*, 928 F.3d 1281, 1288 (11th Cir. 2019). The Court is persuaded by and adopts the Eleventh Circuit panel's thorough reasoning, which addresses and rejects most of the arguments that Mr. Risner raises here regarding the Treaty's validity, as further supported by Government's Exhibit Nos. 3 and 4, the declarations of Tom Heinemann of the U.S. Department of State. *See id.* at 1286-92.

Mr. Risner urges the Court not to do so because, he argues, the *Arias* panel entirely ignored in the opinion the dicta in three Eleventh Circuit opinions, completely ignored two opinions from the Colombian Supreme Court, and completely ignored the voices of both Colombian and United States leaders, including Uribe, Santos, Lambaño, and Senator Rubio, all saying the United States and Colombia do not have a valid treaty. But the Eleventh Circuit's decision did address those matters, as the government's reply persuasively explains, *see* Dkt. No. 70 at 1-8, and the Court is persuaded by and will follow the Eleventh Circuit panel's analysis.

And, as for Government's Exhibit Nos. 3 and 4, the Court admits those

documents over Mr. Risner's objections because, in extradition hearings under Section 3184, Mr. Risner does not have a right to cross-examination, and the government can rely on declarations from absent witnesses. *See In re Ntakirutimana*, No. Civ. A. L-98-43, 1998 WL 655708 (S.D. Tex. Aug. 6,1998), *aff'd sub nom. Ntakirutimana v. Reno*, 184 F.3d 419 (5th Cir. 1999); *Matter of Extradition of Cheung*, 968 F. Supp. 791, 794 n.6 (D. Conn. 1997).

As for Mr. Risner's argument that Colombia's request is prohibited pursuant to Colombian law, the Court will defer to the requesting nation's interpretation of its own law and will not purport to invalidate Colombia's official request for extradition based on the internal laws of Colombia that Mr. Risner in another argument asserts that the Court cannot exercise or act under. And, because there is a ratified treaty in place between the United States and Colombia, the government need not rely on the theory of reciprocity as the basis for the extradition request. But, even if the Court were required to do so, Mr. Risner's pointing to news articles on a number of requests rejected by Colombia does not establish a lack of reciprocity in the face of the evidence that "Colombia routinely acts on U.S. extraditions and, in fact, consistently extradites more fugitives annually to the United States than any other country." Gov't Ex. 4 at ¶ 9.

The Court determines, as did the Eleventh Circuit in recent months, that there is a valid, ratified extradition treaty in effect between the United States and Colombia.

III.  The government has shown probable cause to believe that Mr. Risner committed the offense for which extradition is sought.

"Although the probable cause requirement for the issuance of a certification of extradition is a matter of statute, the applicable extradition treaty often bears upon the scope of probable cause by establishing what constitutes an adequate evidentiary showing." *Haxhiaj v. Hackman*, 528 F.3d 282, 288 (4th Cir. 2008) (citing 18 U.S.C. § 3184; M. Cherif Bassiouni, *International Extradition: United States Law and Practice* 877 (5th ed. 2002); citation omitted).

Article 9 of the Treaty provides that, as to those charged but not yet convicted – unlike Mr. Risner – an extradition request be accompanied by "[a] copy of the indictment or its equivalent issued by a judge or other judicial authority of the Requesting State"; "[e]vidence proving that the person sought is the person to whom the indictment or its equivalent refers; and "[s]uch evidence as would provide probable cause to suspect, according to the laws of the Requested State, that the person sought has committed the offense for which extradition is requested."

But where the extraditee has been convicted and sentenced – like Mr. Risner – Article 9 of the Treaty does not require evidence to show probable cause, only requiring "[a] copy of the judgment of conviction imposed by a court of the Requesting State; "[e]vidence proving that the person sought is the person to whom the conviction refers"; and "a copy of the sentence imposed and a statement showing to what extent the sentence has not been carried out."

In *Arias*, the Eleventh Circuit, in the context of habeas review, recently

discussed the Treaty's application to convicted persons and how that status affects the probable-cause showing:

> Finally, we conclude that the evidence meets the Treaty's requirements for extraditing individuals who have already been convicted. The Treaty provides that when an extradition request "relates to a *convicted* person," such as Arias, the requesting party needs to submit only a "copy of the judgment" and evidence "proving that the person sought is the person to whom the conviction refers." Extradition Treaty, Colom.-U.S., supra, art. 9(4), S. Treaty Doc. No. 97-8, at 4 (emphasis added). Neither party disputes that Arias was convicted or that Colombia submitted the required proof here. We cannot weigh the underlying evidence ourselves to gauge whether we would agree with that conviction. As we have explained, on habeas corpus review, our review is "limited to determining ... whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Martin*, 993 F.2d at 828 (internal quotation marks omitted). Such evidence can of course include the fact that a foreign tribunal has convicted the defendant. *See Spatola v. United States*, 925 F.2d 615, 618 (2d Cir. 1991) ("[A] certified copy of a foreign conviction, obtained following a trial at which the defendant was present" constitutes sufficient evidence.).

*Arias*, 928 F.3d at 1294 (footnote omitted).

And even where extradition treaties require something more than that an extradition request be accompanied by copies of the judgment and the sentence, the court documents themselves often provide the requisite showing of probable cause.

In *Haxhiaj*, for example, the United States Court of Appeals for the Fourth Circuit examined the amount of evidence sufficient to show probable cause where extradition was sought after a conviction *in absentia*, and – beginning with the language of the treaty between the United States and Italy – the Fourth Circuit determined that that agreement "requires more proof than just the fact of an *in absentia* conviction, and directs that a summary of the facts and evidence be supplied

-24-

to establish 'a reasonable basis to believe that the person sought committed the offense for which extradition is requested,' *i.e.,* probable cause under § 3184." 528 F.3d at 289 (citation omitted). But the Fourth Circuit rejected the argument that, for *in absentia* convictions, "actual evidence" – "such as trial testimony or transcripts of the wiretap evidence" – was required and instead concluded "that the certified copy of the appellate opinion of the Court of Appeal of Milan satisfies the showing required by the Treaty and clearly affords a reasonable basis upon which to find probable cause." *Id.*

The Fourth Circuit also rejected the argument that the extradition statute itself "requires the requesting nation to submit underlying trial evidence in support of an *in absentia* conviction," *id.* at 290:

> A foreign conviction entered after a trial at which the defendant was present suffices, in and of itself, to establish probable cause. The extradition court need not "mak[e] an independent assessment of the facts surrounding [the] offenses" and may rely solely on a certified copy of the foreign conviction. Haxhiaj does not challenge this premise, which appears to be widely accepted among the federal courts that have considered the issue.
>
> The principle that foreign convictions generally constitute probable cause under § 3184 is rooted in comity. The duty to extradite internationally arises solely as a matter of treaty and the decision to extradite is ultimately an executive function. "Extradition proceedings are grounded in principles of international comity, which would be ill-served by requiring foreign governments to submit their purposes and procedures to the security of United States courts." To this end, "[q]uestions about the procedural fairness of another sovereign's justice system ... are within the purview of the executive branch," as are questions about "whether the requesting nation is sincere in its demand for extradition or is merely using the process as a subterfuge." Therefore, we refrain "from delving into and assessing the competence of the requesting government's system of justice." To then conclude that foreign convictions "do not constitute probable cause in the United States would require United States judicial officers to review trial records and, consequently, substitute their judgment for that of foreign judges and

juries. Such an inquiry would be inconsistent with principles of comity." The primary tenet of comity is "that, when possible, the decisions of foreign tribunals should be given effect in domestic courts, since recognition fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability through satisfaction of mutual expectations."

According to Haxhiaj, however, when the foreign conviction is *in absentia*, this reasoning does not apply and evidence beyond the fact of the foreign conviction itself is necessary to establish probable cause. By and large, the precedents upon which Haxhiaj relies treat *in absentia* convictions as nothing more than charges of criminal wrongdoing, requiring the government to present proof from which the magistrate judge can make an independent assessment of whether probable cause exists. Underlying the disparate treatment of a conviction rendered *in absentia* is the notion that "a trial *in absentia* is not likely to be a fair trial," affording the accused "no opportunity to confront the prosecution witnesses or to present a defense" and providing no real "assistance in ascertaining the probable guilt of the accused."

In view of the record evidence in this case, it is unnecessary for us to weigh in on the question of whether the fact of a foreign conviction, without more, can ever be sufficient to establish probable cause under § 3184 when the conviction resulted from a trial conducted *in absentia*. Even assuming that the fact of an *in absentia* conviction by itself is an insufficient basis per se for a finding of probable cause, the government presented more than just the fact of conviction. As detailed previously, the excerpts from the appellate opinion go well beyond the mere verdict, summarizing the underlying evidence amassed against Haxhiaj and his co-conspirators. We have found nothing in the body of extradition law to suggest that such independent evidence of probable cause must be the kind of "actual evidence" Haxhiaj is seeking.

In fact, general extradition procedures under § 3184 suggest precisely the opposite. The extradition hearing is not a full criminal trial. Determining the ultimate guilt of the accused, therefore, is a function committed to the justice system of the requesting country. A requirement that the requesting government present "actual evidence" that it intended to submit, or already had submitted, at trial is antithetical to the comity basis that underlies extradition....

*Id.* at 290-91 (concluding "that the evidentiary summary contained within the opinion of the Court of Appeal of Milan is within the scope of evidence that the extradition court may consider in making its limited preliminary decision under § 3184" (citations

and footnote omitted))[1]; *cf. id.* at *2 ("It seems debatable that the international comity justification for the general rule that foreign convictions constitute probable cause under § 3184 would not include *in absentia* foreign convictions. To assume that a foreign proceeding held *in absentia* is unfair and unreliable is essentially to 'delv[e] into and assess[ ] the competence of the requesting government's system of justice.' Questions about the legitimacy and procedural fairness of the Italian justice system are for the executive branch, not the courts, to ponder in determining whether to exercise its discretion to grant an extradition request." (citations omitted)).

---

[1] *See also In re Extradition of Camelo-Grillo*, No. CV 16-9026 JVS (SS), 2017 WL 2945715, at *8 (C.D. Cal. July 10, 2017) (as to an in absentia conviction for murder in Colombia, "[t]he Court adopts the approach taken by the Fourth Circuit in *Haxhiaj* and other courts, in which an in absentia conviction, supported by the court's summary of the evidence presented, may provide probable cause" (citing *Haxhiaj*, 528 F.3d at 289; footnote omitted)); *Matter of Extradition of Blasko*, No. 1:17-mc-00067-DAD-SAB, 2018 WL 6044921, at *9 (E.D. Cal. Nov. 19, 2018) ("The Court finds no merit to the argument that the judgment itself is insufficient to establish probable cause. While courts have denied extradition where the requesting country's submissions are merely conclusory, unsupported by underlying documentation, or were otherwise unreliable, the question to be addressed is whether there is competent legal evidence that 'demonstrate[s] probable cause to believe that the accused committed the crime charged' by the requesting nation. Here, unlike [a] wholly conclusory judgment ... , the requesting nation has provided more than the mere fact of conviction and the sentence that was imposed. The judgment itself is an extensive recitation of the evidence that was considered and contains the testimony and statements of twenty witnesses and other documentary evidence that was considered during the trial of the matter." (citations omitted)); *Nagy v. United States*, No. 4:18 CV 416, 2018 WL 3999683, at *5 (N.D. Ohio June 19, 2018) ("Other courts have reached similar conclusions, relying upon underlying court documents to establish probable cause. ... Thus, given the evidence outlined above from the Romanian court documents, the undersigned recommends the court find the extradition court's probable cause conclusion – that there was probable cause .... Given the case law cited above, this is so even though the evidence relied upon was in the form of court documents from Petitioner's in absentia conviction." (collecting cases)).

Here, as laid out by the government,

[o]n December 9, 1994, the Colombian Criminal Court Six, Circuit of Cartagena, convicted Risner of the aggravated homicide of his wife, Patricia Gomez de Risner (the "victim" or "Risner's wife"), in violation of Article 324 of Colombia's Criminal Code, and sentenced him to twenty years imprisonment. (*See, e.g.,* Dkt. No. 1-1 at Page ID 163-64.) The conviction was twice affirmed on appeal, first by the Superior Tribunal of the Judicial District of Cartagena on April 20, 1995, and then by the Supreme Court of Justice, Criminal Cassation Division, on November 23, 1998. The extradition request [Dkt. No. 1-1] from the Government of Colombia includes all of these court decisions, which reflect the following:

The victim was born in Colombia and lived in Texas. (*See id.* at Page ID 167.) In early July, 1990, the victim and Risner were visiting Cartagena, Colombia, and staying at the Hotel Bellavista. On July 4, 1990, the victim was shot fatally in the head while walking outside a building with her mother in Cartagena. (*Id.* at Page ID 149, 154, 181.)

Colombian police officers arrested Raul Alberto Ramirez Montoya (Ramirez Montoya) and Yolanda Zuluaga Velez ("Zuluaga Velez") at the scene. The two were implicated in the homicide through questioning and were convicted of the murder. (*Id.* at Page ID 149, 167, 181.)

Hotel and other records reflected that three days before the murder, Risner's co-defendant and relative, Jairo Hernandez Pachon ("Hernandez Pachon"), together with companions Ramirez Montoya and Zuluaga Velez, checked into the hotel room adjacent to the one the Risners occupied at Hotel Bellavista. (*See id.* at Page ID 156–57, 160, 177.) Hernandez Pachon paid the bill for himself, Ramirez Montoya, and Zuluaga Velez. (*Id.* at Page ID 160, 177, 182.) Given their proximity to the victim while she was a guest at the hotel, Ramirez Montoya and Zuluaga Velez had opportunities to become aware of the victim's identity and appearance. (*See id.* at Page ID 177.) Further, a Colombian police agent testified that he had obtained confidential information that when Risner and the victim were walking on the beach, Risner "made signs" to hire Hernandez Pachon and his companions. (*Id.* at Page ID 153.)

The Colombian court was aware that Risner was the beneficiary of five policies insuring the victim's life for a total value of approximately USD $1.73 million in the 1990s. (*See id.* at Page ID 152.) Some, if not all, of the insurance companies investigated the victim's death and had declined to pay the proceeds to Risner, prompting him to sue them in the United States District Court for the Northern District of Texas. *See id.* at Page ID 155, 190; *Risner v. Amex Life Assur. Co.*, No. Civ. A No. 3-91-1646, 1993 WL 55957, at *1 (N.D. Tex. Jan. 19, 1993) (noting that Tito Risner was the designated beneficiary of several insurance policies

on the victim's life, on which he tried to collect). The Colombian court had before it the complete report of an investigation that five of the insurance companies had commissioned through private detectives into links between Risner and the victim's murder. (*See* Dkt. No. 1-1 at Page ID 155-56, 183, 190.) The Colombian court also was aware that the aforementioned federal litigation concerning the life insurance proceeds was about to be settled, with the vast majority (according to the extradition request, 85 percent) not to be awarded to Risner and, instead, to be placed in trust for the minor children of Risner and the victim. (*See* Dkt. No. 1-1 at Page ID 155, 190.) The Colombian court, at trial and on appeal, found that Risner, with himself as the beneficiary, had purchased an abnormal number of policies on the victim's life, in an abnormal amount, considering that the victim worked as a nurse and was not exposed to sufficient risk to justify such coverage. (*See id.* at Page ID 156, 170, 176–77.) The policies also exceeded the couple's economic capacity. (*See id.* at Page ID 176–77.)

According to the victim's sister, during the afternoon of the shooting, Risner continuously passed from one side to the other of the windows, from which he could see the street and watch the shooting occur. (*See id.* at Page ID 186.)

Following the murder, Colombian law enforcement interviewed Risner, who seemed defensive and told them he did not know why they were taking his statement. (*See id.* at Page ID 152–53, 174, 182.) Crediting testimony from a police agent who testified based on fifteen years of professional experience and his personal observations of Risner during the interview, the court found that Risner exhibited a strange and cunning attitude at the interview, rather than an interest in understanding why the victim had been killed. (*See id.* at Page ID 153.)

According to the victim's family, Risner told them that they should do nothing with regard to the investigation because there would be no point to it. (*See id.* at Page ID 175; *see also id.* at Page ID 192 (stating that the lower courts considered that Risner "recommended to the family of the victim that they should not carry out any investigation into events, and should not contract a lawyer for that purpose"). In sum, the court found that Risner's "conduct was totally indolent, avoiding any investigation." (*Id.* at Page ID 153.)

Risner departed Colombia on July 6, 1990, the day after the victim's burial. (*See id.* at Page ID 152–53.)

Ramirez Montoya, who ultimately was convicted of the murder, made statements to police in an effort to prove his own innocence. In these statements, he asserted that the police wrongly had inculpated him in the shooting. Ramirez Montoya invoked the victim's husband in his own defense, and described what the victim's husband was wearing, even

though Risner was not on the scene during the shooting or immediately thereafter when police apprehended Ramirez Montoya and removed Ramirez Montoya to a police post. The Colombian court determined that a prior familiarity and criminal link therefore must have existed between Ramirez Montoya and Risner; otherwise, Ramirez Montoya would not have known who the victim's husband was or what he was wearing, and would not have believed it useful to mention an absent stranger in an effort to exculpate himself. (*See id.* at Page ID 154, 176.)

According to the victim's family, although Risner had told the victim that he was a bachelor Spaniard named Tito Jay Risner, they discovered after the victim's murder that, in fact, he was a previously married Colombian named Jose Tito Rodriguez Calderon. In April 1993, the victim's sister reported to Colombian law enforcement, based on information she had received from the fugitive's sister's husband, that Rodriguez Calderon had changed his name to Risner upon moving to the United States. (*See id.* at Page ID 149.) Colombian law enforcement determined, from Colombian civil records including a photographic identity card, that Risner was, in fact, born in Colombia on February 6, 1944, as Jose Tito Rodriguez Calderon (and was listed in records from 1965 as married to a woman named Fronny Avillan, to whom the Colombian court alternately refers as Fronny Saito). (*See id.* at Page ID 149–50, 152.) The Colombian court found, based on testimony from the victim's family, that the victim was unaware of Risner's double identity despite being married to him and having two children with him, that Risner had deceived the victim about his identity, and that this deception indicated that Risner had mounted a plot against the victim. (*Id.* at Page ID 157–58, 178, 186.)

While Risner chose to be physically absent from the Colombian court proceedings against him, the Colombian trial court received and admitted two power-of-attorney forms from him, and counsel represented Risner at trial and on two appeals. A Colombian appellate court expressly rejected Risner's assertion that he had been deprived of a proper defense through counsel. (*See id.* at Page ID 168, 171–73.) Specifically, the Superior Tribunal of the Judicial District of Cartagena recounts the following history in its appellate decision dated April 20, 1995: On December 12, 1991, Risner was summoned for interrogation, but the questioning never occurred because he could not be found. On April 22, 1992, the Colombian court received a power of attorney form from Risner, naming attorney Barreto-Triana from Houston to act as his defense counsel. (*Id.* at Page ID 171.) Barreto-Triana produced a submission stating that Risner was willing to cooperate with the investigation. (*Id.*) The court admitted the power of attorney and scheduled a date of interrogation for May 27, 1992. (*Id.*) Risner failed to appear on that date,

was summoned through his attorney, and again failed to appear. (*Id.*) Risner was implicated via open summons and was declared accused in his absence. (*Id.*) The court appointed attorney Galarza-Dean as *ex officio* counsel to represent Risner. (*Id.*) Galarza-Dean was sworn in and subsequently requested a copy of all documents on file, which copies were ordered. (*Id.* at Page ID 171-72.) When the Prosecution Service decided to close investigations, Galarza-Dean took personal notification of the decision. (*Id.* at Page ID 172.) Once the minutes of the evidence had been assessed, Galarza-Dean took personal notification of the resolution of indictment and appealed against the same. (*Id.*) When trial began, Galarza-Dean requested evidence, including the testimony in public hearing for counter-interrogation and demonstration of Risner's innocence, as appears in his objection in the record; these items were ordered and taken into the files. (*Id.*) At this point, Attorney Barreto-Triana re-appeared and requested to be admitted, asserting that the Prosecution Service or the examining magistrate had, through "involuntary error," not admitted him, and asking that the court admit him and swear him in because his place of litigation was Bogota, and trips to Cartagena would involve substantial expense. (*Id.*) The next day, the court resolved to maintain Galarza Dean as ex officio counsel. (*Id.*) A new power of attorney form from Risner was presented to the court, naming attorney Hernandez Ayazo as principal counsel and Barreto-Triana as his deputy, and *ex-officio* counsel Galarza-Dean was displaced. (*Id.*) The next procedural step was the public hearing, at which Hernandez Ayazo, Risner's counsel of choice, represented Risner. (*Id.*) Among other things, Hernandez Ayazo argued before the trial court for acquittal. (*See id.* at Page ID 148.) At no time did counsel assert any violation of Risner's rights of defense. (*Id.* at Page ID 172) The Colombian appeals court found, based on the record, that "at no time has the technical defense of TITO RISNER suffered any impairment." (*Id.*) Rather:

> In effect, when [Risner] granted the power of attorney to [Barreto-Triana], he had not become the subject of criminal process, precisely because there was a simple imputation against him, attributing him with a participation in a punishable deed, and therefore the examining magistrate admitted him, but in order for him to initiate his functions in the interrogation of RISNER, since it is by virtue of implication through interrogation that RISNER would become a subject of process .... It should be noted that it is from the time of implication in process through interrogation or declaration of accusation in absence that the suspect becomes an accused, or subject of process, and

if this situation is not present, then a defense cannot intervene except to request engagement in the process.

[Risner], despite having stated on several occasions a date on which he would make a statement, did not appear, and this refusal caused him to be engaged or implicated by public summons and a declaration of absence, as noted. And it caused the appointment of an ex officio defense counsel resident in the city, who rapidly was sworn in, and performed his functions step by step, and if he did not take the case to appeal, this cannot be seen as a lack of defense, or deficient defense, since it is known that on occasions silence is precisely the best means of defense. The ex officio defense counsel was consciensous [sic], and personally undertook to receive notice of decisions, and request evidence. And it cannot be said that the assistance of the person subsequently appointed counsel could have changed the course of the process. It should be noted that in the hearing, the defense counsel for RISNER, refrained from interrogating [the] sister of the deceased, who accompanied him [sic] on the day of the events, and in relation to [the victim's] mother, he limited himself to subjects such as her relation with [Risner], how he had known [the victim], the amount of the insurance. But he never questioned her regarding the murder, although [she] was with her when she received the fatal shot. Nor did the defense counsel engaged by RISNER complained [sic] that his client had been barely advised, or that the supply of one or another piece of evidence would have changed his situation in the process.

This allowed the conclusion that the rights to defense of [Risner] in this case have been preserved in their entirety. That he had technical assistance from the time of his implication in the process. And that if he did not exercise that right materially, it was not the lack of opportunity to do so, but due to his attitude. Risner was represented by adequate defense counsel throughout the process and was given full opportunity to present a defense.

(*Id.* at Page ID 172–73.)

The Colombian court decisions indicate that Risner's Colombian counsel did not contest that Risner is Rodriguez Calderon. (*See, e.g., id.* at Page ID 184.)

Dkt. No. 63 at 4-11 (footnotes omitted).

This summary of the evidence supporting Mr. Risner's conviction, contained in the legal decisions from the Colombian courts, establishes probable cause as required by the extradition statute. But Mr. Risner argues that "[t]his court must consider both the narrative presented by the government and [his] explanatory evidence." Dkt. No. 69 at 14. And he offers evidence gathered recently in an attempt eliminate the above showing of probable cause. *See, e.g.*, Dkt. No. 69 at 14-21; Dkt. No. 66; Dkt. No. 69-1; Dkt. No. 71-1.

As previously explained, "the scope of an evidentiary hearing is not to determine guilt or innocence" *Bonilla*, 2014 WL 934903, at *3, as such

> [t]he range of evidence that a defendant may introduce as to probable cause at an extradition hearing is limited. Courts have traditionally distinguished between inadmissible "contradictory evidence," which merely conflicts with the government's evidence, and admissible "explanatory evidence," which entirely eliminates probable cause. *See, e.g., Barapind v. Enomoto*, 360 F.3d 1061, 1069 (9th Cir. 2004) ("The general rule is that evidence that explains away or completely obliterates probable cause is admissible, while evidence that merely controverts the existence of probable cause is not.") (internal quotation marks omitted); *Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991) ("Although it is within the discretion of the district court to permit the relator to offer limited, explanatory evidence relating to the charges against him, contradictory evidence properly may be excluded.") (citations omitted). In practice, this line is not easily drawn, but the rule serves the useful purpose of allowing the defendant "to present reasonably clear-cut proof ... of limited scope [that has] some reasonable chance of negating a showing of probable cause," while preventing the extradition proceedings from becoming "a dress rehearsal trial." *Koskotas*, 931 F.2d at 175 (internal quotation marks omitted).

*Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006); *see, e.g., In re Extradition of Garcia*, 825 F. Supp. 2d 810, 829 (S.D. Tex. 2011) ("The distinction between 'contradictory

evidence' and 'explanatory evidence' is difficult to articulate. However, the purpose behind the rule is reasonably clear. In admitting 'explanatory evidence,' the intention is to afford an accused person the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause." (quoting *Matter of Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978))); *Ntakirutimana*, 1998 WL 655708, at *25 ("Likewise, another court has explained that '[w]hat tends to obliterate probable cause may be considered but not what merely contradicts it. The improbability or the vagueness of the testimony may destroy the probability of guilt, but the tendering of witnesses who testify to an opposite version of the facts does not. The latter must await a trial on the merits.' 'Thus,' another court held, 'the extraditee cannot avoid extradition simply by contradicting the requesting country's case. Rather, the extraditee must "negate" or "obliterate" the requesting country's showing of probable cause.'" (citations omitted)).

The evidence that Mr. Risner characterizes as explanatory includes the results of a 2019 investigation undertaken by a private investigator he retained, the findings of which are presented through her affidavits, *see* Dkt. Nos. 66-2; 66-3; 69-1; 71-1, and through her testimony at the July 31, 2019 hearing, *see* Dkt. No. 74. Mr. Risner also provides the legal opinion from a Colombian lawyer he retained concerning the Colombian criminal proceedings. *See* Dkt. No. 66-1.

The Court notes first that Mr. Risner's investigation did uncover evidence that contradicts an aspect of the probable cause showing made through the court documents – at least on the version of those documents translated into English – related to where

his family stayed in Cartagena prior to his wife's murder. As counsel for the government conceded at the extradition hearing,

> it's true that the shooters stayed in a room with Mr. Risner's relative, Hernandez Pachon. And it's true that the Colombian record says ... that Mr. Risner's relative and the shooters were adjacent to the Risners. It appears from the Spanish translation that they're saying that that occurred on the beach as opposed to in a hotel room. In other words, that there was an opportunity before the shooting for them to observe, to visually identify the victim. But we are no longer insisting that the Risners stayed at the hotel.

Dkt. No. 74 at 66:5-15.

Because this finding from Mr. Risner's investigation conflicts with the probable-cause showing established by the court documents, and because the government's concession does not eliminate probable cause, this evidence falls outside the scope of what the Court may consider at an extradition hearing. The same holds true for the rest of Mr. Risner's proffered evidence. While this evidence may be helpful to him in a proceeding to collaterally attack his Colombian conviction (in Colombia), it is outside the scope of this proceeding. That is, to fully consider his evidence – including that torture was used to obtain testimony against him; that his sister-in-law's husband considered Mr. Risner to be his sworn enemy and worked to promote Mr. Risner's prosecution; and that his sister-in-law has now recanted her prior testimony, all offered through the testimony of his private investigator – would impermissibly turn this proceeding into a trial on his guilt or innocence. *See Noeller*, 922 F.3d at 803-04 ("A United States court dealing with an extradition request for an accused is obliged to resist any temptation to judge the guilt or innocence of the accused. 'It is fundamental

that the person whose extradition is sought is not entitled to a full trial at the magistrate's probable cause hearing.' The foreign government making the request is not required to try its case in a United States court." (quoting *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981); citing *Santos*, 830 F.3d at 991)).

For example, to the extent that Mr. Risner offers the legal opinion of a Colombian lawyer [Dkt. No. 66-1] as explanatory evidence, that opinion is "irrelevant to these proceedings." *Matter of Extradition of Mainero*, 990 F. Supp. 1208, 1215 (S.D. Cal. 1997) (as to the findings of a Mexican law expert, "which asserted procedural, substantive and constitutional infirmities under Mexican law in the extradition request and in the arrest warrant," determining that "[t]he long list of challenges to the probable cause finding in Mexico and the other alleged infirmities are not fully set forth herein as the Court finds the opinions of Attorney Gastelum are irrelevant to these proceedings.").

Mr. Risner also raises – through his private investigator's testimony – the prospect that Guillermo Pinzon, the now-deceased husband of his deceased wife's sister, launched a vendetta against him. *See* Dkt. No. 66-2 at 2 ("The exceptional involvement of Guillermo Pinzon (deceased) in the Colombian criminal matter and the United States insurance investigation ... heavily influenced and ultimately tainted the integrity of each process. Mr. Pinzon, a First Sergeant in the National Police Force, controlled the Colombian criminal investigation and heavily influenced the family of the deceased ... and the insurance investigation, against Mr. Risner."); *accord* Dkt. No. 74 at 54-55.

But, "under the general rule of non-contradiction, the accused in an extradition hearing has no right to pose questions of credibility as in an ordinary trial, but only to offer evidence which explains away that proof or completely rebuts the existence of probable cause. In other words, evidence merely contradicting the credibility of witnesses is not allowed." *In re Extradition of Vargas*, 978 F. Supp. 2d 734, 748 (S.D. Tex. 2013) (citing *Garza v. United States*, 180 F. App'x 522, 523 (5th Cir. 2006) (affirming district court's refusal "to admit an affidavit from a private investigator showing that the driver of the shooter's car was unable to identify [the extraditee] as the shooter from a photo line-up" because, at most, the affidavit "only challenged [the] credibility" of the testimony (citations omitted)); citations omitted).

More broadly, a challenge to the integrity of the Colombian criminal proceedings against Mr. Risner are outside the scope of the Court's limited role in an extradition proceeding. *See, e.g.*, *Blasko v. Thomas*, No. 1:18-cv-01649-DAD-SAB, 2019 WL 1081209, at *15 (E.D. Cal. Mar. 7, 2019) ("To the extent that Petitioner argues that the proceedings in Slovakia were riddled with procedural irregularities, such issues are beyond the limited review of this Court and are reserved for the Secretary of State." (citing *Santos*, 830 F.3d at 1039-40; *Haxhiaj*, 528 F.3d at 290; *Camelo-Grillo*, 2017 WL 2945715, at *9)); *Bogue*, 1998 WL 966070, at *2 ("A determination of the French government's procedural fairness in undertaking the petitioner's trial in his absence, however, is beyond the scope of this Court's review. These are questions which are better left to the Secretary of State, who can adequately determine whether

humanitarian issues preclude extradition." (citation omitted)).[2]

Mr. Risner's proffered evidence also notably includes a statement from his late wife's sister recanting her previous testimony.

While at least the United States Court of Appeals for the Seventh Circuit has upheld the exclusion of recantation evidence – there, declarations from the petitioner's accomplices recanting their "prior detailed testimony implicating the petitioner in the bombing" – because "[t]he later testimony [did] not explain the government's evidence,

---

[2] *See also Arias*, 928 F.3d at 1294-95 ("So, while Arias may raise serious concerns about the motivation for his prosecution, the fairness of his trial, and the severity of his sentence, he must direct those complaints to the Executive Branch. To hold otherwise would also contravene the 'rule of non-inquiry,' which precludes courts 'from assessing the investigative, judicial, and penal systems of foreign nations when reviewing an extradition request.' Like 'extradition procedures generally,' the rule flows from 'concerns about institutional competence and by notions of separation of powers.' We have neither the power nor competence to consider a foreign fugitive's concerns about the fairness of his country's criminal justice system, let alone halt his extradition on that basis – that kind of consideration is properly addressed to the Executive Branch. To that end, the rule also 'serves interests of international comity by relegating to political actors the sensitive foreign policy judgments that are often involved in the question of whether to refuse an extradition request.' [And t]he rule applies even though a foreign court's procedures might differ from our own traditions." (citations omitted)); *Mainero*, 990 F. Supp. at 1226 ("A great number of questions exist, and many questions remain unanswered in this case. These questions cannot be answered within the narrow confines of an extradition proceeding and would be most properly addressed by the Secretary of State and/or the Court in Mexico on a trial on the merits. The scope of this proceeding is narrow and is limited to the existence of probable cause and the evidence, received by virtue of the Treaty provisions and applicable law."); *Noeller*, 922 F.3d at 808 ("'Once an individual is certified by a court as extraditable, the Secretary of State 'exercises broad discretion and may properly consider factors affecting both the individual defendant as well as foreign relations' in deciding whether extradition is appropriate.' Courts must therefore 'refrain from investigating the fairness of a requesting nation's justice system, and from inquiring into the procedures or treatment which await a surrendered fugitive in the requesting country.'" (citations omitted)).

rather [it] tend[ed] to contradict or challenge the credibility of the facts implicating petitioner," *Eain*, 641 F.2d at 511-12, the federal district courts "have been divided as to whether recantation evidence constitutes contradictory evidence," *Kapoor v. Dunne*, 606 F. App'x 11, 13 (2d Cir. 2015) (per curiam); *accord Hoxha*, 465 F.3d at 561. And "lower courts have generally looked at the circumstances of the recantation itself in determining its admissibility." *Kapoor*, 606 F. App'x at 13 (citing *United States v. Pena-Bencosme*, No. 05-M-1518 (SMG), 2007 WL 3231978, at *5 (E.D.N.Y. Oct. 30, 2007)).

"Where a recantation is received, it is only because it bears strong indicia of reliability, such as a recantation made during the course of a court proceeding or made against the interests of the individual recanting, and obliterates probable cause." *Pena-Bencosme*, 2007 WL 3231978, at *5 (collecting authority, including *In re Extradition of Contreras*, 800 F. Supp. 1462, 1468-69 (S.D. Tex. 1992) (finding that recantations by all 11 co-defendants during a court proceeding were sufficiently reliable to obliterate probable cause); *In re Extradition of Strunk*, 293 F. Supp. 2d 1117, 1126 (E.D. Cal. 2003) ("Where the only evidence to support probable cause is the unrecanted confession, courts have admitted the recantation as obliterating probable cause." (citations omitted))). "Courts, however, have been reluctant to consider recantation evidence where, as here, 'the credibility of [the witness'] recantation cannot be determined without a trial.'" *Id.* at *6 (quoting *In re Extradition of Singh*, 170 F. Supp. 2d 982, 1025 (E.D. Cal. 2001), *aff'd in part sub nom. Barapind v. Enomoto*, 400 F.3d 744, 749 (9th Cir. 2005)).

The recantation here does not itself obliterate probable cause. And it was not made in a court proceeding. Rather, it is reported to the Court through the private investigator's recounting of a conversation that she had with Ms. Gomez earlier this year:

> Pinzon reported that during his interview with Gloria Gomez, she stated that Mr. Risner "continuously passed from one side to the other of the hotel windows, from which he could see the street and watch the shooting." This statement was one of the main points cited to by the Colombian court in support of the conviction of Mr. Risner.
> On 25 April 2019, Gloria Gomez in a telephone conversation recanted this statement and said that Mr. Risner did not exhibit the behavior reported by Mr. Pinzon.

Dkt. No. 66-2 at 3.

This medium simply does not allow the Court to make a credibility determination as to the recantation.

Similarly, the Court is not in a position to evaluate the veracity of Ms. Zuluaga's April 2019 report to the private investigator that she was tortured by police in an effort to make her implicate Mr. Risner. *See id.* at 6; Dkt. No. 74 at 52-53. In *Santos*, for example, the en banc United States Court of Appeals for the Ninth Circuit held that, while "[e]vidence that a statement was obtained by coercion may be treated as 'explanatory' evidence that is admissible in an extradition hearing," 830 F.3d at 1008, "the scope of [this] holding is limited" and "should not be taken as a license to engage in mini-trials on the question of coercion or torture," *id.* at 1007.

> The extradition court does not have to determine which party's evidence represents the truth where the facts are contested. Where an extradition court first considers evidence that a statement was improperly obtained, but concludes that it is impossible to determine the credibility of the

allegations without exceeding the scope of an extradition court's limited review, the court has fulfilled its obligation – as the extradition court did in *Barapind*. If the court cannot determine the credibility of the allegations (or other evidence) once it has examined them, the inquiry ends. Probable cause is not undermined, and the court must certify the extradition. *See* 18 U.S.C. § 3184.

*Id.* So it is here.

And, to reiterate, the conclusion that Mr. Risner's evidence falls outside "[t]he range of evidence that a defendant may introduce as to probable cause at an extradition hearing" because his evidence is not "'explanatory evidence,' which entirely eliminates probable cause," *Hoxha*, 465 F.3d at 561, not only applies to each example discussed in detail above but also to all evidence Mr. Risner has presented, *see, e.g.,* Dkt. No. 69 at 14-21 (summary chart).

In sum, the government, on behalf of Colombia, has carried its burden to show that there is "a reasonable ground to believe [Mr. Risner] guilty of the crime" for which he was convicted of in Colombia. *Quintanilla*, 582 F. App'x at 415. And Mr. Risner has not "negate[d] or obliterate[d] the requesting country's showing of probable cause." *Ntakirutimana*, 1998 WL 655708, at *25 (citations and internal quotation marks omitted).

## Conclusion

For the reasons explained above, the Court finds that Tito Jay Risner a/k/a Jay Michael Risner a/k/a Tito Risner a/k/a Jay M. Risner a/k/a Jose Tito Rodriguez Calderon is extraditable to the Republic of Colombia to serve a sentence for aggravated homicide.

No later than **December 2, 2019**, the government shall file a proposed extradition certification and order of commitment.

The Court will then order the Clerk of Court to forward certified copies of this Memorandum Opinion and Order, Certification of Extradition, and Order of Commitment, together with a copy of all the testimony and evidence taken before the Court and all memoranda of law filed on the issue of extradition, to the Secretary of State, Department of State, to the attention of the Office of Legal Adviser.

Mr. Risner shall remain in the custody of the United States Marshal and confined in a proper facility until surrender is made to a duly qualified agent of the Republic of Colombia or until further order from this Court or direction from the Secretary of State.

SO ORDERED.

DATED: November 18, 2019

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE